ORDER
Petitioner ' Claudia Milena Vanegas Franco’s Motion to Reissue Memorandum of Decision, to reflect her voluntary dismissal, is GRANTED. A copy of the corrected memorandum disposition is attached hereto and ordered filed.
CORRECTED MEMORANDUM *
Luz Divia Franco Garces (“Garces”) was -in charge of the “social action” for the Foundation of Businesses for Peace (“FUNDAEMPAZ”),[1] an organization which promotes human rights in Colombia and speaks out against guerilla violence by the National Liberation Army (“ELN”). Garces and her two younger daughters (the “petitioners”) fled Colombia on March 5, 2001, after a series of events left them in fear of their lives. Their concerns began in October 2000, when Garces and her family started to receive telephone death threats several times each day as a result of her membership in FUNDAEMPAZ. During the same time period, Garces was also aware that other members of FUN- *14 DAEMPAZ had received similar death threats and that some had actually been killed or abducted. Then, during the last week of February 2001, an unknown assailant shot into the petitioners’ home. Finally, on March 2, 2001, a man and a woman in a taxicab drove up to Garces’s home while she was sitting on the balcony at the front of her house. The woman pointed a gun at Garces, who fled into the house. The taxicab then drove away. The petitioners had had enough and boarded a plane bound for Spain several days later, but en route decided to seek asylum, withholding of removal, and relief under the Convention Against Torture (“CAT”) upon their arrival in the United States.
Although finding Garces and her daughter Claudia credible, the Immigration Judge (“IJ”) rejected all of the petitioners’ claims. The Board of Immigration Appeals (“BIA”) affirmed in a divided decision.[2] The facts are known to the parties and we repeat them here only where necessary. For the reasons expressed below, we grant the petition in part because we find that a reasonable factfinder would be compelled to conclude that the petitioners have demonstrated past persecution. We remand this case to the BIA to allow it the initial opportunity to determine, on the present record, whether the government has successfully rebutted the presumption that the petitioners have a well-founded fear of future persecution, which would otherwise entitle the petitioners to asylum and withholding of removal.
I.
To qualify for asylum, the petitioners must establish that they are unwilling to return to Colombia “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” Lopez v. Ashcroft, 366 F.3d 799, 802-03 (9th Cir.2004). To establish past persecution, the petitioners must provide evidence of “(1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control.” Id. Demonstration of past persecution gives rise to a presumption of future persecution, which the government can rebut by showing changed conditions or that petitioners could safely relocate to another part of the country. Id. at 802.
II.
The IJ rejected petitioners’ asylum claim, holding that they could not establish past persecution because the death threats Garces received were via telephone and not acted upon.[3] The IJ explained:
The respondent in this case has received several threats, all of which were tele-phonically while she was at home. No one ever directly approached the respondent. The second incident which the respondent described in which she was seated on the balcony, the assailant never took any action against the respondent. They simply point[ed] what she thought was a weapon and moved on. They never took any follow-up actions with regard to the threat.
*15 In Lim v. INS, 224 F.3d 929 (9th Cir.2000), we stated that “[tjhreats standing alone ... constitute past persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm.” Id. at 936. In that case, petitioner received only death threats over the course of six years, and while he was followed by unidentified men, “[n]either [he] nor his family was ever touched, robbed, imprisoned, forcibly recruited, detained, interrogated, trespassed upon, or even closely confronted.” Id.
We once again looked at what is required to establish past persecution in Ruano v. Ashcroft, 301 F.3d 1155 (9th Cir.2002). There, Ruano received 30-35 letters containing death threats over the course of six years as a result of his membership in a Guatemalan political party. Id. at 1157. On several occasions, four armed men followed and tried to corner Ruano. Id. at 1158. He also testified that he had a number of face-to-face encounters with anonymous pursuers, but that they were never able to catch him. Id. Other members of the political party had also been killed by guerillas. Id. The court distinguished Lim because it found that Ruano was “ ‘closely confronted’ and put in harm’s way on numerous occasions by men he knew to be armed and out to get him.” Id. at 1160. “By contrast, Lim was never closely confronted or, as in Ruano’s case, actively chased by men he knew were armed; Lim was never pursued while at home; nor was Lim’s family ever confronted or asked about Lim’s whereabouts.” Id.
In Ruano, we relied on Reyes-Guerrero v. INS, 192 F.3d 1241 (9th Cir.1999), to find past persecution. Reyes-Guerrero was a Colombian prosecutor who was assigned to investigate and prosecute an embezzlement scheme involving a rival political party. Id. at 1243. Four years after he was assigned the case, he began receiving death threats that urged him to stop pursuing the investigation. Id. He was also approached twice and offered bribes to drop the investigation. Id. We held that Reyes-Guerrero established past persecution based on the receipt of multiple death threats over the course of seven years and the fact that he was confronted on two occasions with bribery offers.[4] Id. at 1246.
Here, we find that the petitioners have adequately set forth a claim of past persecution. We have stated that when a petitioner testifies credibly “the question remaining to be answered becomes whether [those] facts, and their reasonable inferences, satisfy the elements of the claim for relief. No further corroboration is required.” Ladha v. INS, 215 F.3d 889, 900 (9th Cir.2000). To determine whether a finding of past persecution is compelled, we look to the totality of the circumstances. See Guo v. Ashcroft, 361 F.3d 1194, 1203 (9th Cir.2004). Here, Garces and her family received threatening telephone calls several times a day for approximately five months before leaving Colombia. The callers told her to leave FUNDAEMPAZ or something bad would happen, and that they knew where her daughters went to school. Garces also testified that she was aware that FUN-DAEMPAZ received telephone threats and fliers that threatened ELN was going to blow the organization up. Then, at the end of February 2001, the petitioners’ home was shot at while they were on vacation. Although Garces testified that *16 she did not conclusively know who shot her house, she stated “we had been living at that house for 15 years and that kind of thing had never happened before, so we felt that it was totally related to the threats we had received.” She believed that the assailants thought they were at home because they left the lights on in the house. Because Garces was so afraid of these threats and the shooting, she stated that she did not allow her daughters to attend school the last 20 days they were in Colombia. Finally, a week after the shooting, on March 2, 2001, a man and a woman drove up in a taxicab to Garces’s house while she was sitting on the balcony at the front of her house and the woman pointed a gun at her. Garces testified that the assailant was not able to shoot at her because she rushed into her house, but that she was “sure that [the female assailant] intended to kill [her].” • She reported this to the police on March 4, 2001.[5]
Garces also stated that she knew of other FUNDAEMPAZ members who received similar threats and had either been killed or abducted. Garces testified that other members received telephone death threats and that the callers would tell them the same thing that they told her family. Fernando Ahumada was a member of FUNDAEMPAZ who received similar death threats and was killed.[6] - Other members of FUNDAEMPAZ, including Claudia Liliana Rubio Pazos were abducted. . The petitioners also submitted what appears to be a Colombian Attorney General’s Office report detailing a complaint filed by Lina Maria Zuluaga Valencia. Valencia and her husband worked in FUN-DAEMPAZ’s Cali, Colombia office until they received a series of telephone death threats in October and November 2000. The couple fled Cali to Bogota, Colombia, after a friend who received similar death threats was killed. Even after moving to Bogota, the couple continued to receive telephone death threats and threatening pamphlets in the mail. Valencia stated that she believed that approximately 30 of FUNDAEMPAZ’s 100 members received death threats.[7]
We find that the facts of this case are more akin to Ruano and Reyes-Guerrero than Lim because Garces was “closely confronted.” The evidence of repeated death threats over the course of five months, that other members of FUNDAEMPAZ had received similar death threats and several had been abducted or killed, the shooting of the petitioners’ house, and the incident where an armed assailant pointed *17 a firearm at Garees together compel a finding of political persecution within the meaning of the asylum statute. Although the government asserts that there is no evidence to link ELN’s death threats to the incidents where the family home was shot and where the female assailant pointed a handgun at Garees, we find that there is a reasonable inference that these incidents are related given their temporal proximity. A conclusion that these incidents are coincidental or unrelated is an unreasonable reading of the record. In all, the record conclusively establishes: (1) that ELN is a guerrilla group that the Colombian government cannot control; (2) that ELN targeted petitioners because of Garces’s membership in FUNDAEMPAZ, an organization that is devoted to seeking-political change; and (3) that these incidents rose to the level of past persecution because petitioners were “closely confronted” and put in harm’s way. Accordingly, we reverse the IJ’s finding that the petitioners could not satisfy then- burden of establishing past persecution because the assailant never actually fired her weapon at Garees. We have never required such a showing and follow our precedent that death threats in combination with being “closely confronted” by armed assailants establishes past persecution.
Since the petitioners have demonstrated past persecution, they are entitled to a presumption of a well-founded fear of future persecution. See Mamouzian v. Ashcroft, 390 F.3d 1129, 1135 (9th Cir.2004); 8 C.F.R. § 1208.13(b)(1). “The government must then rebut that presumption by demonstrating by a preponderance of evidence that country conditions have changed or that relocation is possible, so that the petitioner no longer has a well-founded fear that she would be persecuted if she were to return.” Mamouzian, 390 F.3d at 1135; 8 C.F.R. § 1208.13(b)(1). Because we reverse the IJ on the past persecution determination, we remand to the BIA to address in the first instance whether the government has successfully rebutted the presumption that the ’ petitioners have a well-founded fear of future persecution.[8]
III.
Our decision on past persecution also entitles the petitioners to a presumption of eligibility for withholding of removal. See 8 C.F.R. § 1208.16(b)(l)(i). It is the government’s burden to rebut that presumption by a preponderance of the evidence.See 8 C.F.R. § 1208.16(b)(l)(ii). Like the petitioners’ asylum claim, we remand to the BIA to address in the first instance whether the government has successfully rebutted the presumption of eligibility for withholding of removal.
IV.
The petitioners’ contentions regarding relief under CAT are unpersuasive. They have not established “that it is more likely than not that [they] ... would be tortured if removed” to Colombia. Zheng v. Ashcroft, 332 F.3d 1186, 1194 (9th Cir.2003) (citation omitted). We therefore deny this claim.
Y.
Accordingly, we grant the petition as to the petitioners’ asylum and withholding claims, deny the petition as to their CAT claim, and remand for further proceedings consistent with this disposition.

 This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

. It is unclear from the record what the "social action” specifically denotes; however, it appears that Garces helped members by providing medicine through a pharmacy that she owned.

. The dissenting BIA member stated "I respectfully dissent. The nature of the threats received by the respondents appear to qualify as past persecution under Ninth Circuit law and give rise to a presumption of future persecution that has not been rebutted.”

. The government does not contest that these incidents were on account of Garces's membership in FUNDAEMPAZ, and thus politically motivated, or that the Colombian government is unable to control ELN.

. We also note that death threats along with harm to the petitioner’s family may establish past persecution. See Baballah v. Ashcroft, 367 F.3d 1067, 1074-75 (9th Cir.2004); Salazar-Paucar v. INS, 281 F.3d 1069, 1075 (9th Cir.2002).

.Petitioners also point to evidence relating to: (1) an incident where Claudia Vanegas Franco was riding home in a taxicab and she was dusted with white powder and temporarily abducted; and (2) an incident where Garces's brother Nelson Franco, also a FUN-DAEMPAZ member, was riding a motorcycle and was struck by an automobile. We do not find that these incidents support a finding of past persecution because there is no reason to believe that they are tied to ELN. We do note, however, that Nelson Franco also fled Colombia and sought asylum in the United States. Although the record does not indicate the specific nature of his asylum claim, it does indicate that his asylum petition was granted.

. Garces also testified that she knew somebody whose entire family was killed by guerrillas, although it is unclear from the record whether they were members of FUNDAEM-PAZ or whether ELN was responsible.

. Petitioners also called an expert witness on ELN who testified that “ELN targets unarmed civilians as part of what they perceive to be their legitimate political purpose. And when they start to make threats, they will move to the next stage of acting on those threats and carrying out those threats because if they don't, they lose legitimacy in some ways as a threatening organization, as a guerrilla organization. So, they can't just threaten and then not follow up.”

. We lack jurisdiction to consider the petitioners' claim of humanitarian asylum because they never presented this claim before the agency. See Barron v. Ashcroft, 358 F.3d 674, 678 (9th Cir.2004).